# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

      v.

BROADWIND ENERGY, INC.,
J. CAMERON DRECOLL, and
STEPHANIE K. KUSHNER,

          Defendants.

Civil Action No. 15-cv-1142

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

## NATURE OF THE ACTION

1. This matter involves accounting and disclosure violations by Broadwind Energy, Inc. ("Broadwind") arising from its failure to record and disclose a $58 million impairment charge prior to a public offering in January 2010. In the registration statement for the offering, Broadwind failed to disclose the impairment of intangible assets caused by the severe deterioration of the two most significant customer relationships at its largest subsidiary, Brad Foote Gear Works, Inc. ("Brad Foote"). As early as August 2009, senior management anticipated substantial impairment of its intangible assets and shared this knowledge with its auditors, investment bankers, and lender. However, Broadwind did not disclose any impairment to the investing public. When Broadwind finally recorded and disclosed the charge in an annual

report filed only two months after the offering, Broadwind's share price declined 29% on increased volume.

2.     Although he should have known that the intangible assets were impaired, Broadwind's Chief Executive Officer ("CEO") at the time, J. Cameron Drecoll ("Drecoll"), approved and certified public filings containing these misrepresentations and misleading omissions.  Drecoll personally sold over $6.3 million worth of stock through the offering.

3.     Broadwind's newly hired Chief Financial Officer ("CFO"), Stephanie K. Kushner ("Kushner"), failed to take the steps necessary to ensure that the financial statements and disclosures were accurate.

4.     The deterioration in customer relationships that produced the impairment charge also compromised Brad Foote's ability to meet monthly debt covenants associated with its primary credit facility.  To avoid default and other negative consequences, Brad Foote personnel accelerated revenue to meet its covenants until Broadwind could raise funds to retire the credit facility through the offering in January 2010.  Broadwind failed to disclose this practice and its effect on future revenue in the registration statement used in the offering.  In addition, as a result of the transactions, Broadwind reported $4 million of improperly recognized revenue for the third and fourth quarters of 2009.

## JURISDICTION AND VENUE

5.     The Commission brings this action pursuant to Section 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

6.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

7.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.  Moreover, certain defendants reside or transact business in this district.

8.      Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

### DEFENDANTS

9.      **Broadwind Energy, Inc.** ("Broadwind or the "Company") is an alternative energy company incorporated in Delaware and headquartered in Naperville, Illinois.  The Company originally was incorporated in Nevada in 1996 as Blackfoot Enterprises, Inc. and, in 2006, completed a reverse merger with Tower Tech Systems, Inc. ("Tower Tech").  Following several acquisitions from 2007 to 2008, Tower Tech reincorporated in Delaware and changed its name to Broadwind.  In connection with these acquisitions, Broadwind purchased Brad Foote Gear Works, Inc. ("Brad Foote") on October 19, 2007 to provide gear systems for the wind turbine and other energy industries.  Broadwind's common stock was quoted on the OTC Bulletin Board until April 9, 2009, when its common stock began trading on the NASDAQ Global Select Market.  Broadwind's common stock is registered with the Commission pursuant

to Section 12(b) of the Securities Act, and Broadwind files periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

10.     **J. Cameron Drecoll** ("Drecoll"), age 60, resides in Naperville, Illinois.  Drecoll served as Broadwind's CEO and as a director from October 19, 2007 until his retirement on December 1, 2010.  He was appointed to these positions in connection with Broadwind's acquisition of Brad Foote, where he held the positions of majority stockholder and CEO since 1996.

11.     **Stephanie K. Kushner** ("Kushner"), age 59, resides in Hinsdale, Illinois.  Since August 15, 2009, Kushner has served as Broadwind's Executive Vice President, CFO, and Treasurer.

## FACTS

### Acquisition of Brad Foote

12.     From 2007 to 2008, a private equity firm seeking to invest in the wind energy market ("PE Firm") combined several component businesses to create an integrated supplier to wind turbine manufacturers, developers, and operators.

13.     After acquiring control of a manufacturer of wind turbine towers, PE Firm financed the acquisition of Brad Foote, which produced gear systems for wind turbines.  The Brad Foote acquisition was completed on October 19, 2007.  The purchase price for Brad Foote consisted of $64 million in cash, $64 million in stock, and the assumption of $26 million of debt.

14.     Prior to the acquisition, Drecoll was the CEO and majority stockholder of Brad Foote. Drecoll became CEO and a director of the combined entity and received $43 million in cash and 13 million shares.

15.     Following additional acquisitions through 2008, the combined entity changed its name to Broadwind.  At the completion of the acquisitions, PE Firm controlled 49% of Broadwind, and Drecoll held 13%.

## Impairment

### *Relationships with Customer 1 and Customer 2*

16.     Through Broadwind's gearing segment, Brad Foote contributed approximately half of Broadwind's revenues and assets for 2008, and its performance substantially affected the performance of the combined entity.  In turn, Brad Foote's sales and earnings depended heavily upon relationships with its two most significant customers, Customer 1 and Customer 2.

17.     Brad Foote's relationship with Customer 1 was formalized in a three-year agreement entered on November 5, 2007.  Customer 1 agreed to source 33% to 50% of its gear set requirements from Brad Foote, and Brad Foote agreed to maintain capacity to produce Customer 1's requirements to certain limits.

18.     Similarly, on April 7, 2008, Brad Foote executed a long-term supply agreement with Customer 2.  Customer 2 agreed to source 85% of its requirements for a period of at least three years, and Brad Foote guaranteed the capacity to meet Customer 2's annual estimated usage.

19.     Both agreements, which were negotiated by Drecoll, established pricing and other terms and conditions.

20.     Although Brad Foote entered both contracts with an expectation of future volume, and in practice Customer 1 and Customer 2 sourced nearly all of their gear sets from Brad Foote, neither agreement guaranteed minimum purchases, as the requirements were subject to Customer 1 and Customer 2's own production needs. Given the lead times associated with manufacturing

of the gear sets, Customer 1 and Customer 2 provided advanced orders and long-term forecasts to Brad Foote.

### *Initial Recording of Intangible Assets*

21.     Generally accepted accounting principles ("GAAP") typically do not permit the recognition of intangible assets, such as customer relationships, as independent assets on the balance sheet.  An exception to this general rule is intangible assets purchased in connection with a business combination.  In that context, GAAP requires the consideration for an acquisition to be allocated across the tangible and intangible assets, with the remainder recorded as goodwill.

22.     In connection with the Brad Foote acquisition in October 2007, Broadwind recorded amortizable intangible assets of $76 million and goodwill of $26 million.  Nearly the entire $76 million intangible asset related to Brad Foote's contracts with Customer 1 and Customer 2, which were recorded at $62 million and $13 million, respectively.

23.     To establish the intangible asset value, management relied on a valuation conducted by an appraisal firm ("Appraisal Firm 1").  Appraisal Firm 1's valuation depended in substantial part on the forecasted net cash flows derived from the Customer 1 and Customer 2 contracts over ten- and nine-year periods, respectively.  Appraisal Firm 1 calculated those net cash flows from forecasts and estimated growth rates provided by senior managers at Broadwind, including Drecoll.  The net sales forecasts reflected management's anticipation of aggressive growth.

### *Impairment Standard*

24.     Once established, an intangible asset is subject to periodic impairment testing. According to Accounting Standards Codification ("ASC") 360, originally promulgated as Financial Accounting Standard ("FAS") 144, an intangible asset is impaired when the carrying amount of the asset exceeds its fair value.  A company is required to make this determination

6

"whenever events or changes in circumstance indicate that its carrying amount may not be recoverable." One such "triggering event" is "a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (or asset group)." Other examples of such triggering events include "a significant adverse change in the extent or manner in which a long-lived asset (or asset group) is being used or in its physical condition" or "a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (or asset group), including an adverse action or assessment by a regulator."

25. Broadwind purported to follow the accounting principles established by FAS 144. According to its public filings, Broadwind understood that the following developments would trigger impairment testing and lead to potential impairment of its intangible assets: "significant underperformance relative to historical or projected future operating results, termination or renegotiation of a significant contract, significant changes in the manner of use of the assets or the strategy for the overall business, a significant decrease in the market value of the assets, or significant negative industry or economic trends."

26. The responsibility for this assessment rested with senior management at Broadwind.

27. As discussed below, by the third quarter of 2009, the intangible assets associated with the Customer 1 and Customer 2 relationships met these tests, and Broadwind should have known that these assets were impaired.

### Decline of Customer Relationships Beginning in Late 2008

28. Beginning in late 2008, Customer 1 and Customer 2 significantly reduced actual and forecasted orders, causing substantial declines in Brad Foote's projected revenue associated with those relationships. In September 2008, Broadwind's then-CFO also acknowledged serious

concerns about the profitability of the Customer 2 contract.  Similarly, in November and December 2008, Broadwind and Brad Foote management identified sizable operating losses and liquidity issues at Customer 1 that would impact Brad Foote negatively.

29.     In connection with these developments, Broadwind senior management began to discuss the potential impairment implications stemming from reduced order flow.

30.     Broadwind management reacted to the downturn by planning or implementing numerous initiatives to rationalize the business, including decreasing headcount, returning machines to equipment suppliers, altering production schedules, and withholding investments in additional capacity.

31.     During a meeting attended by Drecoll in December 2008, Broadwind and Brad Foote management also renegotiated aspects of the Customer 1 agreement, obtaining Customer 1's release of the capacity requirements, and began to seek business from other non-wind customers to replace the lost revenue.

32.     Beyond the immediate effect of reducing available cash flows from operations, the downturn constrained Broadwind's access to financing.  In late 2008, Brad Foote's primary lender ("Bank") determined to discontinue its relationship with Brad Foote and assigned Brad Foote to its workout group.  By early 2009, Bank reduced Brad Foote's credit availability from $10 million to $3 million.  At the same time, PE Firm, which historically had provided significant funding, decided not to commit any additional capital to Broadwind.

### First Quarter 2009

33.     Throughout the first quarter of 2009, the declines in Customer 1 and Customer 2 revenues and forecasts worsened, falling more than 66% and 71% from the original forecast used to value the customer relationships.  That same quarter, Customer 2 also reduced its forecast for 2010.

34.     Brad Foote management reported these negative developments to senior managers at Broadwind, including Drecoll.

35.     Other concerns observed in late 2008 persisted into the first quarter.  For instance, Broadwind management continued to harbor doubt about Customer 1's financial viability.  On March 20, 2009, Broadwind's CFO at the time advised senior management of all Broadwind reporting units that future Customer 1 orders or contracts "MUST be done on a 100% pre-pay basis" and that Broadwind was "not going to take any credit risk with Customer 1."

36.     In response to these developments and in anticipation of a decline in orders, Brad Foote took steps to restructure its workforce and operations, laying off more than 200 employees and senior staff through at least three workforce reductions, and reducing its material orders from suppliers.  Brad Foote continued to seek business from other non-wind customers to replace the significant declines.  It also approached Customer 2 for various commercial concessions and support, asking Customer 2 to accelerate orders into the first quarter and requesting cash advances.

37.     Notwithstanding these efforts, the shortfall caused Brad Foote to miss forecasts that only recently had been provided to Bank and further weakened its primary banking relationship.

38.     While preparing its 2008 annual report in early 2009, Broadwind received early indications of potential impairment of its intangible assets.  During its financial statement audit, Broadwind retained Appraisal Firm 1 to test its goodwill and intangible assets for potential impairment.  In March 2009, Appraisal Firm 1 informed Broadwind that it had calculated a $15 million impairment charge associated with the Customer 1 contract.  Appraisal Firm 1 subsequently modified its calculations, which resulted in no impairment.  Although the Company

ultimately did not disclose a charge in its 2008 Form 10-K, following consultation with its outside auditors ("Auditor"), Appraisal Firm 1's preliminary result placed Broadwind's management, including Drecoll, on further notice of the potential for impairment.

### Second Quarter 2009

39.     During the second quarter of 2009, the Customer 1 and Customer 2 relationships deteriorated more precipitously, as reflected by the following developments:

- In May 2009, Brad Foote asked Customer 2 to provide $6 million worth of financial support by accelerating 2010 orders into 2009.

- At a special board meeting convened on June 9, 2009, Brad Foote management reported to the Board that Brad Foote would produce no more than $85 million in sales for 2009, compared to the $120 million in previously anticipated sales. Management also reported that Customer 1 revenue forecasts had decreased to $30 million and that Customer 2 revenue forecasts had declined to $15 million.

- In late June 2009, Customer 1 suspended shipments from Brad Foote due to large inventory levels and reduced forecasts from its own customers. Customer 1 also delayed making a substantial payment due to Brad Foote until after the quarter end, further raising concerns about Customer 1's liquidity.

- In connection with the "massive and sudden schedule" reduction imposed by Customer 1 and other developments, Broadwind and Brad Foote began developing a "life without Customer 1" business plan, and several members of management expressed the desire to exit the relationship. Broadwind's Chief Operating Officer at the time specifically predicted that Customer 1 could be out of business by year end.

- Brad Foote continued its efforts to redirect sales from Customer 1 and Customer 2 to new customers and implemented additional workforce reductions. By this point, Brad Foote had eliminated at least 250 employees through these reductions.

- For Brad Foote as a whole, second quarter 2009 revenue fell 31% against the second quarter of 2008 and 24% compared to the first quarter of 2009, and its gross margin turned *negative*.

40.     Broadwind management, including Drecoll, was aware of these developments and the implications for impairment of Brad Foote's intangible assets. In the second quarter, Auditor supplied an accounting update to the Broadwind finance team that addressed impairment testing,

and Broadwind's Controller at the time asked Auditor for training materials regarding the application of FAS 144 impairment testing standards.

41.     More specifically, in response to the "life without Customer 1" dialogue in August 2009, a member of the Brad Foote finance team raised the effect of the recent developments on impairment.  The concern was elevated to various members of senior management at Brad Foote and at Broadwind.  Rather than addressing the issue, Drecoll and Broadwind's acting CFO at the time adopted a wait-and-see approach, deferring to annual impairment testing to be conducted in October 2009.

### Third Quarter 2009

42.     In the third quarter of 2009, Brad Foote's actual and forecasted revenue continued to decline.  Specifically, year-to-date revenues from Customer 1 and Customer 2 through September 30, 2009 declined 43% and 25%, respectively, compared to the same period ending September 30, 2008.

43.     On July 8, 2009, Customer 1 reduced its 2009 forecast further to $19 million, a 77% decline from the forecast used for the original valuation.  Within weeks, Customer 1 also formally asserted a $3 million warranty claim and claimed a right of offset.  As a result of the declines, Brad Foote's manufacturing assets were being utilized at only 35% capacity.

44.     On July 29, 2009, Drecoll provided the Board a "rationalization update" that described the precipitous decline and the restructuring that management was taking to respond to weak performance.  A presentation discussing "risks to [the] income statement" identified "continued loss of volume" and "impairment at subsidiaries."

45.     The declines in actual and forecasted results were not limited to 2009.  Revenue forecasts for 2010 also continued to decline.  On July 30, 2009, Customer 1 submitted a 2010 forecast amounting to revenue of approximately $10 million.  This forecast was 13% of the

$125 million projection used to establish the acquisition value of the Customer 1 contract. Around this same time, Brad Foote management also learned that the forecasts from Customer 2 for the years 2010 to 2012 represented, on average, a 70% decline from the comparable period forecasts originally used to value the Customer 2 contract. Drecoll and others at Broadwind were provided with these forecasts.

46.     Given the divergence between the Customer 1 and Customer 2 forecasts originally used in 2008 to value the contracts and the outlook by the time of the July 2009 board meeting, Drecoll and others at Broadwind should have known by the third quarter of 2009 that it had not and would not meet the revenue projections used to value the customer relationships.

47.     The sales decline produced additional financial distress at Broadwind and Brad Foote. In July 2009, on the day that Customer 1 lowered its 2009 forecast to $19 million, Brad Foote met with Customer 2 to discuss ways in which Customer 2 could support Brad Foote, explaining that the failure to do so would trigger violation of its debt covenants. A month later, Brad Foote implored Customer 1 for relief, asking Customer 1 "to bring 2010 orders up as early as possible." Given his historical involvement with Brad Foote, and the importance of the customer relationships, Drecoll was aware of the requests for financial support.

48.     Kushner began to learn of Brad Foote's struggles shortly after joining Broadwind on August 15, 2009. In August 2009, Kushner spoke with the Board about the deteriorating cash position and the growing urgency around Broadwind's liquidity. Management also continued to seek new customers to replace Customer 1, and Kushner explained to investment bankers in September 2009 that Customer 1 figures would not represent nearly as much of the Company's business as it had in the past.

12

49.     A Board meeting was scheduled for October 1, 2009 to determine whether Broadwind should sever its relationship with Customer 1.  The Board decided on October 1, 2009 not to sever Broadwind's relationship with Customer 1.

50.     During the third quarter, Broadwind and Brad Foote management, including Drecoll and Kushner, openly discussed whether there could be a triggering event with respect to Customer 1.

51.     Broadwind also began to plan more definitively for the impairment of Brad Foote's intangible assets.  Beginning in August 2009, Broadwind's internal budgeted balance sheets and income statements for 2010 and other documents reflected management's assumption that the entire Customer 1 contract intangible asset would be impaired by December 31, 2009. Most of these documents, which were reviewed by Drecoll and Kushner, specifically identified an expected charge of $48 million.  Broadwind shared this expectation and these documents with its outside audit firm, its investment bankers, and Brad Foote's primary lender.

52.     Broadwind also incorporated impairment in its planning for its upcoming audit of 2009 financial results.

53.     Based on the revenue decline that already had occurred in 2008 and 2009, combined with the Customer 1 and Customer 2 forecasts and other developments, Broadwind and Drecoll should have known that the intangible assets were impaired.  However, Broadwind failed to disclose the impairment of its assets in its Form 10-Q filed on November 2, 2009, opting instead for a generalized risk disclosure of the possibility of such a charge.

*Misrepresentations and Omissions in Form 10-Q for Third Quarter 2009*

54.     Broadwind filed its Form 10-Q for the third quarter of 2009 on November 2, 2009.  Prior to filing, the Form 10-Q was reviewed by Auditor and Broadwind's outside counsel.

13

55.     At the time the third-quarter report was being prepared, Broadwind anticipated that it would be proceeding with its offering in late November 2009.

56.     Broadwind failed to notify investors of the impairment of its intangible assets in its Form 10-Q for the third quarter of 2009.  In the notes to its financial statements, Broadwind explained that, "[t]he Company performs its impairment test of goodwill as of October 31 of each year and tests intangible assets for impairment only when events or circumstances indicate that the carrying value of these assets may not be recovered."  Broadwind then represented that "[d]uring the three and nine months ended September 30, 2009 and 2008, the Company did not record an impairment charge related to its intangible assets."

57.     In Management's Discussion and Analysis ("MD&A"), Broadwind simply repeated the generalized disclosure regarding the potential effect of market conditions on impairment that previously had been discussed in its second-quarter filing:

> [A] continued economic slowdown may result in impairment to our fixed assets, goodwill and intangible assets. We perform an annual goodwill impairment test during the fourth quarter of each year, or more frequently when events or circumstances indicate that the carrying value of our assets may not be recovered. The recession that has occurred during 2008 and 2009 has impacted our financial results and has reduced purchases from certain of our key customers. We may determine that our expectations of future financial results and cash flows from one or more of our businesses has decreased or a decrease in stock valuation may occur, which could result in a review of our goodwill and intangible assets associated with these businesses. Since a large portion of the value of our intangibles has been ascribed to projected revenues from certain key customers, a change in our expectation of future cash from one or more of these customers could indicate potential impairment to the carrying value of our assets.

58.     Broadwind also repeated the general description of its impairment accounting policies that had been included in prior filings.  In the summary of critical accounting policies in MD&A, Broadwind represented that it tested intangible assets for impairment "only when events or circumstances indicate that the carrying value of the Company's assets may not be recovered,"

with the amount of any impairment based on the extent that projected future discounted cash flows fell short of the carrying value of the intangible assets.

59.    The filing, which Drecoll and Kushner certified, included no other substantive discussion of impairment.

60.    Broadwind's disclosures in its quarterly report were materially misleading.

61.    At the time of the offering, Broadwind and Drecoll should have known that the intangible assets associated with Customer 1 and Customer 2 were substantially impaired. Among other things:

- Beginning in late 2008, Customer 1 and Customer 2 substantially reduced orders and forecasted orders. Broadwind management also identified concerns about the profitability of the Customer 2 contract, renegotiated aspects of the Customer 1 agreement, and began to seek new non-wind business to replace the reduced Customer 1 and Customer 2 demand.

- In March 2009, an initial fair value analysis of the Customer 1 contract prepared by Appraisal Firm 1 in connection with Broadwind's annual impairment testing reflected a $15 million impairment.

- Brad Foote's relationship with Customer 1 had been strained by a combination of payment delays, warranty claims, and quality concerns by Customer 1. These contributed to uncertainty regarding Customer 1's ability to continue as a going concern.

- In July 2009, Drecoll presented the Board with sharply reduced forecasts. At that time, Drecoll understood that Customer 1 and Customer 2 would fall significantly short of expectations for multiple years. Drecoll also understood that Customer 2 products generated low or negative margins and that management had approached Customer 1 and Customer 2 for substantial financial support.

- As early as August 2009, Drecoll, Kushner, and others expected the entire Customer 1 intangible asset would be completely impaired as of December 31, 2009 and based Broadwind's budgeted financial statements on that expectation. Kushner communicated this expectation to its auditors, its investment bankers, and Brad Foote's primary lender.

62.    Given the information that she had about the impairment, Kushner should have taken the steps necessary that Broadwind's financial statements and disclosures were accurate.

15

63.     Had Broadwind conducted impairment testing in connection with its third quarter Form 10-Q, Broadwind would have concluded that the Customer 1 and Customer 2 contracts were fully impaired and recorded impairment charges of $49.8 million and $10.2 million, respectively.  As a result, Broadwind overstated its intangible assets and failed to disclose a material impairment charge.

64.     In addition, because its intangible assets actually were impaired at the time, Broadwind's discussion that there was a significant risk of substantial or total impairment (that had not transpired) was materially misleading.

### Fourth Quarter 2009

65.     At the October 1, 2009 Board meeting, the Board decided not to terminate the relationship with Customer 1. However, Broadwind continued to budget for and anticipate impairment in several documents and communications through December 2009.

66.     The anticipated performance for the fourth quarter was so weak that Brad Foote determined in November 2009 to shut down its plant for nearly all of December 2009 and executed another workforce reduction.

67.     On December 21, 2009, Broadwind's Director of Financial Reporting provided Customer 1 and Customer 2 forecasts to an appraisal firm hired to conduct impairment testing for Broadwind's 2009 annual financial statements ("Appraisal Firm 2").  The forecasts were consistent with forecasts presented to the Board in July 2009.

### January 2010 Offering

68.     The degradation in performance across the first three quarters of 2009 and lack of access to capital exacerbated the financial distress Broadwind had been experiencing since late 2008.

69.     In light of the liquidity crisis, Kushner presented a "financing options update" to Broadwind's Executive Committee on October 8, 2009 to review various financing options. As part of her presentation, Kushner highlighted that the customer intangible would be written off at year-end 2009 for $48.2 million, pending the formal valuation assessment.

70.     After evaluating several options, Broadwind elected to raise additional capital through a follow-on offering of its stock, often referred to as a "re-IPO," and began to prepare a registration statement.

71.     As preparation for the offering progressed, Broadwind management continued to share its expectation of impairment. Among other things, investment bankers continued to anticipate large impairment charges based on communications from management, primarily Drecoll and Kushner. For example, the original lead underwriter ("Investment Banker 1") highlighted in its underwriting committee memorandum a "pending impairment charge":

> Broadwind also plans to announce an impairment charge to goodwill at its Brad Foote subsidiary as part of its Fourth Quarter 2009 results. When it announces its Third Quarter earnings, the Company will disclose that it expects an impairment charge to goodwill at its Brad Foote subsidiary. This disclosure will be made prior to the time of pricing of the offering, but the amount will not be disclosed. The amount will be disclosed when the Company releases its Fourth Quarter results. Based on Brad Foote's current performance, the Company expects that this impairment will be material and estimates it at ~$48MM.

72.     Broadwind originally had planned for the offering to proceed by late November 2009. On October 27, 2009, the eve of filing the initial registration statement, Investment Banker 1 withdrew from the transaction due to concerns of its underwriting committee. Among other issues, Investment Banker 1 informed Kushner that it "want[ed] a more strongly worded disclosure on the possible/probable impairment on the goodwill."

73.     Broadwind continued to express in other contexts its belief that the assets were impaired. After Investment Banker 1's withdrawal, Broadwind engaged Investment Banker 2 as

an underwriter for the transaction. In early November 2009, representatives of Investment Banker 2 attended a diligence meeting with Broadwind management, including Drecoll and Kushner. Documents reflect that during that meeting, Broadwind suggested that impairment write-downs were not only possible, but likely.

74. In addition, various versions of a budget presentation delivered to the Board on December 17, 2009 assumed the complete impairment of the Customer 1 contract as of December 31, 2009, "pending outcome of independent analysis."

75. Broadwind failed to expedite its retention of Appraisal Firm 2 or its delivery of necessary data and documents to Appraisal Firm 2 so that it could determine the impairment charge prior to the public offering. For example, although Auditor suggested in September 2009 to begin the impairment testing process early, Broadwind did not select an appraisal firm until the middle of November 2009 and did not deliver the majority of documents necessary for Appraisal Firm 2's analysis until late December 2009. Broadwind did not provide all of the primary documents used in Appraisal Firm 2's analysis until late January 2010.

76. On January 21, 2010, Broadwind completed its public offering of 10 million shares at a price of $5.75 per share. Alongside Broadwind's offering, Drecoll sold 1.1 million shares for $6.3 million. In March 2011, Kushner was awarded a cash bonus of $130,000, in part for her work on the January 2010 offering.

### Misrepresentations and Omissions During January 2010 Offering

77. In anticipation of the January 2010 offering, Broadwind filed a registration statement with the Commission. The registration statement was initially filed on October 30, 2009 and was amended various times between November 6, 2009 and January 14, 2010. The registration statement went effective on January 14, 2010.

18

78.     All versions of Broadwind's registration statement included the financial statements that had been included in the Forms 10-Q filed through the end of the third quarter, September 30, 2009, and expressly incorporated prior reports by reference.

79.     The draft registration statements were reviewed by Broadwind's outside counsel, investment bankers, and Auditor.

80.     The registration statement did not disclose the impairment. Broadwind simply included the following generalized risk disclosure, much of which was taken from a prior registration statement:

> Our future operating results and the market price of our common stock could be materially adversely affected if we are required to write down the carrying value of goodwill or intangible assets associated with any of our operating segments in the future.
>
> We review our goodwill and intangible balances for impairment on at least an annual basis through the application of a fair-value-based test. Our estimate of fair-value for each of our operating segments is based primarily on projected future results and cash flows and other assumptions. In addition, we review long-lived assets whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. . . . In the future, if our projected discounted cash flows associated with our operating segments do not exceed the carrying value of their net assets, we may be required to record additional write downs of the carrying value of goodwill, intangible assets or other long-lived assets associated with any of our operating segments and our operating results and the market price of our common stock may be materially adversely affected.
>
> As of September 30, 2009 our goodwill and intangible balances were $34.0 million and $96.9 million respectively. We perform an annual goodwill impairment test during the fourth quarter of each year, or more frequently when events or circumstances indicate that the carrying value of our assets may not be recovered. The 2008-2009 recession has impacted our financial results and has reduced near-term purchases from certain of our key customers. We may determine that our expectations of future financial results and cash flows from one or more of our businesses has decreased or a decrease in stock valuation may occur, which could result in a review of our goodwill and intangible assets associated with these businesses. Since a large portion of the value of our intangibles has been ascribed to projected revenues from certain key customers, a change in our expectation of future cash from one or more of these customers could indicate potential impairment to the carrying value of our assets.

81.     As part of its review of Broadwind's registration statement, the SEC's Division of
Corporation Finance issued Broadwind a comment letter in late November 2009.  In response to
comments questioning the Company's impairment disclosures, Broadwind added more detail to
its description of its significant accounting policies in its MD&A and the notes to consolidated
financial statements.  Broadwind wrote:

> We evaluate the recoverability of other long-lived assets, including property, plant
> and equipment and certain identifiable intangible assets, whenever events or changes
> in circumstances indicate that the carrying amount of an asset may not be recoverable.
> We perform impairment tests of indefinite-lived intangible assets on an annual basis
> or more frequently in certain circumstances. Factors considered important which
> could trigger an impairment review include significant underperformance relative to
> historical or projected future operating results, termination or renegotiation of a
> significant contract, significant changes in the manner of use of the assets or the
> strategy for the overall business, a significant decrease in the market value of the
> assets or significant negative industry or economic trends. When we determine that
> the carrying amount of long-lived assets may not be recoverable based upon the
> existence of one or more of the indicators, the assets are assessed for impairment
> based on the estimated future undiscounted cash flows expected to result from the use
> of the asset and its eventual disposition. If the carrying amount of an asset exceeds its
> estimated future undiscounted cash flows, an impairment loss is recorded for the
> excess of the asset's carrying amount over its fair value.

82.     However, the additional language simply provided more detail about the testing
process and did not alter the substance of Broadwind's disclosures regarding impairment or the
risk of impairment.  If anything, the added disclosure may have rendered the registration
statement more misleading, because the listing of the factors could reasonably be viewed as an
implicit representation that these particular triggering events had not occurred.

83.     Broadwind's notes to its unaudited financial statements regarding goodwill and
intangible assets used the same language as in prior filings, including the generalized cautionary
language about the potential effects of "a continued economic slowdown."

84.     As was the case with the third-quarter Form 10-Q, Broadwind's registration
statement was misleading.  Broadwind incorporated third-quarter financial statements that did

not report the material impairment charge and failed to disclose that its intangible assets already had been substantially impaired. In addition, Broadwind's registration statement discussed a risk of impairment, when in fact that risk already had materialized.

85. Failing to disclose the impairment allowed Broadwind to proceed with an offering that was critical to its financial survival and to give the impression that its business was stronger than actual and predicted results established.

86. At the time of the offering, Broadwind and Drecoll should have known that the intangible assets associated with Customer 1 and Customer 2 were substantially impaired.

### Disclosure of Impairment Charge

87. Less than two weeks after the completion of the offering, on February 2, 2010, Appraisal Firm 2 informed Broadwind's Controller of its finding that the Customer 1 intangible asset would be substantially impaired and that the Customer 2 intangible asset would be impaired completely.

88. Approximately one month later, Broadwind disclosed the impairment in its 2009 Form 10-K and earnings release, filed on March 12, 2010. Broadwind disclosed a $58 million charge to intangible assets and full impairment of its goodwill related to Brad Foote in the amount of $24 million.

89. The impairment charge was material. Described by the Board as "significant," the charge reduced the value assigned to customer contracts by 94%. Of the $58 million intangible impairment charge, $56 million directly related to the declining value of the Customer 1 and Customer 2 relationships. Largely as a result of the charge, Broadwind's operating loss for the year increased from $28 million to $110 million on reported revenues of $198 million.

90.     Following the revelation of the charge, Broadwind's stock declined 21%, from a closing price of $5.68 on March 11, 2010 to a closing price of $4.47 on March 12, 2010, on increased volume.  On the next trading day, March 15, 2010, the price fell another 8% from the March 11, 2010 price to $4.11, for a total decline of 29%.  In contrast, the broader market, as reflected by the Nasdaq Composite Index, was essentially unchanged for these two days, moving from $2,368 on March 12, 2010 to $2,362, a difference of 0.3%.

91.     The charge also was material because it signaled serious weaknesses in the Company's long-term prospects, particularly with two of the industry's largest players.

### Misrepresentations and Omissions in Form 10-K for the 2009 Fiscal Year

92.     In its MD&A section in its Form 10-K for the 2009 fiscal year, which was filed on March 12, 2010, Broadwind represented the following:

> We review our goodwill balances for impairment on at least an annual basis and review our intangible and other long-lived assets for impairment whenever events or changes in circumstances indicate that the asset's carrying value amount may not be recoverable. We performed our review of goodwill based on the carrying value of these assets as of October 31, 2009, and the estimate of fair-value for each of our operating segments was based primarily on projected future results, cash flows and other assumptions. We did not identify a triggering event during 2009 which would require an early assessment of impairment, however, in connection with our annual goodwill impairment analysis as of October 31, 2009 which we completed in March 2010, we determined that the goodwill balance attributable to our Gearing segment was impaired due to a deterioration in financial performance during 2009 and as a result of the subsequent fourth quarter revision in our projection of future operating results and cash flows in light of the effect of the continued economic downturn on the wind gearing industry. . . . Accordingly, we recorded goodwill and intangible impairment charges of $24,269 and $57,942, respectively, to properly reflect the carrying value of these assets.

93.     In the notes to its consolidated financial statements for December 31, 2009 and prior years, Broadwind disclosed that:

> The Company reviews intangible assets and other long-lived assets for impairment whenever events or changes in circumstances indicate that the asset's carrying amount may not be recoverable. Due to the revision in our projections of operating results and cash flows within our Gearing segment during the fourth quarter, the

Company deemed this a triggering event, and subsequently tested our intangible assets for impairment. The completion of our impairment analysis in March 2010 indicated that the customer relationship intangibles associated with our Gearing segment were impaired during the fourth quarter as a result of a decline in projected future operating results. The decline in our estimates of future operating results and corresponding discounted cash flows indicated that the fair value of these customer relationships were less than the carrying value of these assets.

94.     These disclosures were inaccurate and misleading because the declines identified by management occurred prior to the fourth quarter.  The forecast declines that led to the impairment were known to the Company by the third quarter of 2009.

## Revenue Recognition

95.     The dramatic decline of Customer 1 and Customer 2 volumes that produced the impairment charge also seriously compromised Brad Foote's ability to comply with several debt covenants and to preserve its access to needed capital and liquidity.

96.     To avoid default and other negative consequences associated with the failure to meet its debt covenants, and to conceal its true extent of its deterioration, Brad Foote personnel accelerated at least $7.4 million of revenue during the third and fourth quarters of 2009 until Broadwind could raise funds to retire the credit facility through the offering in January 2010. During the offering, Broadwind failed to disclose that it only met its debt covenants by accelerating revenue from future periods.

97.     Although management identified and corrected a subset of these transactions between the January 2010 offering and the filing of its annual report in March 2010, Broadwind overstated revenue in its third-quarter Form 10-Q and 2009 Form 10-K.

### *Pressure on Brad Foote and Poor Control Environment*

98.     The substantial declines in revenue and earnings exerted significant pressure on Brad Foote's financial condition beginning in late 2008.

99.    In 2008 and 2009, Brad Foote violated its debt covenants on certain occasions, but received waivers from Bank.  In some instances, Bank required modifications of the bank agreement to grant the waivers.  As its condition deteriorated further in the first half of 2009, Brad Foote failed to meet its debt covenants at March 31, 2009 and June 30, 2009, prompting Bank and Brad Foote to amend the loan agreement on August 7, 2009.  Among other things, the amendment introduced a monthly cumulative net revenue covenant.  Broadwind's filings, including its registration statement, noted the significance of covenant compliance to its ability to finance its Brad Foote operations.  The amendment of the loan agreement increased pressure on Brad Foote's month-end revenue.  Communications at Brad Foote, some of which were shared with Drecoll, reflected an intense focus on monthly revenue.

100.    Simultaneously, the percentage of revenue Brad Foote recorded at each month end increased substantially.  As overall revenue declined precipitously, the percentage of revenue recognized in the last two days of each month rose from approximately 34% in July 2009 to 79% in November 2009.  In other words, by November 2009, nearly all of Brad Foote's revenue was being recognized in the last two days of the month.  Although this month-end concentration of revenue was not inherently problematic, it should have alerted Broadwind management to the potential for improper revenue recognition.

101.    Broadwind management knew that Brad Foote was meeting its covenants each month by the slimmest of margins.

102.    Broadwind management also understood that the Company had weak revenue recognition controls, including at the Brad Foote subsidiary.  Broadwind previously had disclosed in its 2007 and 2008 annual reports material weaknesses related to revenue recognition

24

practices at Brad Foote and other subsidiaries. After the offering, the Company again disclosed internal control failures and material weaknesses in its annual report for 2009.

### *Accelerated Revenue Recognition*

103.    To meet its debt covenants, Brad Foote accelerated at least $7.4 million of revenue. Brad Foote obtained at least $3 million of this amount through a "pull-ahead" agreement with Customer 2 to bring 2010 revenue into 2009. In addition to the $3 million accelerated through the Customer 2 agreement, Brad Foote accelerated revenue by entering into improper bill-and-hold arrangements; shipping unwanted or unauthorized product to customers; shipping product at month end knowing that it would not be accepted until the next month or period; delivering incomplete or defective parts; and delaying recognition of returns to a future period. Had Brad Foote not engaged in these transactions to accelerate its revenue, it would not have met its debt covenants.

### **Customer 2 Pull-Ahead Agreement**

104.    In response to forecast reductions in early 2009, Brad Foote personnel approached Customer 2 about pulling $6 million of orders from 2010 into 2009 "to ensure [Brad Foote's] future compliance with debt covenants" and its ability to continue supplying gearboxes to Customer 2.

105.    Brad Foote's proposal was not requested by Customer 2 or tied to any commercial need on the part of Customer 2 beyond the survival of a critical supplier.

106.    The 150 sets were to be pulled from requirements that were scheduled to ship in 2010 and would not be consumed until the first half of 2010.

107.    Because Customer 2 had no need for the sets and would carry the 150 sets as excess inventory, Brad Foote proposed "to cover Customer 2's carrying and storage costs through deflation in 2010."

108.    In addition, because the long-term agreement with Customer 2 provided for an annual reduction in prices paid by Customer 2, Brad Foote agreed to accept 2010 prices for the parts.

109.    Brad Foote committed that it would not ship the products to Customer 2 if it were able to identify new business from other customers.

110.    After initially refusing the request, Customer 2 agreed to provide $3 million of support.  Customer 2 scheduled the 75 sets to be delivered from late August 2009 through November 2009.

111.    Brad Foote's delivery of these sets caused significant disruption at Customer 2, given its lack of need for the parts until 2010.

112.    Brad Foote paid Customer 2 the carrying cost and the price reduction through a 1.5% discount that was spread over shipments that occurred in 2010.

### Other Transactions

113.    Brad Foote also met debt covenants by engaging in other types of transactions that accelerated revenue from a later period.  These transactions did not satisfy the criteria for revenue recognition discussed in Staff Accounting Bulletin No. 104.

114.    Per that guidance, revenue generally may be recognized when (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.

115.    During the third and fourth quarters of 2009, Brad Foote prematurely recognized revenue from the following types of transactions:

- **Bill-and-Hold Arrangements**—On multiple occasions, Brad Foote sales personnel initiated bill-and-hold transactions, several of which involved shipping product to a storage location prior to customer receipt.  These transactions failed

26

to meet the criteria to recognize revenue under a bill-and-hold arrangement. Among other things, Brad Foote, not the customer, requested that the transactions be on a bill-and-hold basis. Further, the transactions, which were not customary, had no substantial business purpose beyond accelerating revenue. Brad Foote, not the customer, typically paid the shipping and storage costs associated with these transactions. In some instances, Brad Foote failed to segregate the product properly, and at least one transaction was documented with a backdated side letter.

- **Unauthorized Shipments**—In October and November 2009, Brad Foote personnel shipped product prior to customer authorization.

- **End-of-Month Shipments**—On numerous occasions, Brad Foote employees intentionally shipped product to Customer 2 and other customers at the end of the month with the understanding that it would not arrive until the following month or period. However, the purchase order that governed shipments to Customer 2 provided that title and risk of loss did not transfer until the product *arrived* at Customer 2.

116. For these transactions, Brad Foote prematurely recognized revenue upon shipment. On other occasions, Brad Foote also preserved revenue by failing to recognize returns at the proper time.

### *Misleading Disclosures*

117. During the offering, Broadwind failed to disclose its acceleration of revenue to meet its debt covenants.

118. In its registration statement, Broadwind acknowledged the importance of the bank facility to its financial health and liquidity, as well as the significance of the compliance with certain revenue covenants.

119. The discussion of covenant compliance in its MD&A and the notes to incorporated financial statements failed to disclose that Broadwind met these critical debt covenants from August to November 2009 by accelerating Brad Foote revenue from 2010 into 2009. Brad Foote would not have made its covenants in the third and fourth quarters of 2009

27

without the support from Customer 2 or the revenue it gained by engaging in the other practices discussed above.

120.     More generally, these transactions were unusual practices at Broadwind's most significant operating division.

121.     In addition, Broadwind should have, but did not, disclose that the pull-ahead and revenue recognition practices materially decreased its 2010 revenue expectations.

### Effect on Financial Statements

122.     Not all of the transactions discussed in Paragraphs 104 to 116 impacted Broadwind's reported financial statements in its 2009 Form 10-K. Between the January 2010 offering and the filing of its annual financial statements in March 2010, an internal review conducted by Broadwind's corporate management identified many of these transactions as problematic.

123.     The internal review identified aggressive tactics designed to meet monthly debt covenants across at least seven transactions, most of which occurred in November 2009.

124.     The findings precipitated, at least in part, the departure of several managers at Brad Foote.

125.     As a result of the review, Broadwind corrected several revenue entries prior to reporting its year-end results. Certain other transactions did not affect Broadwind's reported financial statements.

126.     After allowing for these adjustments, however, Broadwind's financial statements still included at least $3.8 million of revenue that had not been recorded properly. These transactions caused third quarter 2009 revenue to be overstated by approximately $1.1 million and fourth quarter 2009 revenue to be overstated by approximately $2.7 million.

127.    This revenue was material to Broadwind's financial results.  Brad Foote personnel entered into the problematic transactions in order to meet debt covenants associated with its primary credit facility at a time of considerable financial pressure.  In the third quarter, the misstated revenue amounted to 2% of consolidated revenue and 8% of gearing revenue.  In the fourth quarter, the misstated revenue was 8% of consolidated revenue and 28% of gearing revenue.  On an annual basis, Broadwind improperly accelerated 6% of gearing revenue and 2% of consolidated revenue.

## COUNT I

### VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(2)]
### (Against Defendants Broadwind and Drecoll)

128.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

129.    By their conduct, Defendants Broadwind and Drecoll, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    By reason of the foregoing, Defendants Broadwind and Drecoll violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT II

### VIOLATIONS OF SECTION 13(a) OF THE EXCHANGE ACT
### AND RULES 12b-20, 13a-1, AND 13a-13 THEREUNDER
### [15 U.S.C. § 78m & 17 C.F.R. § 240.12b-20, 13a-1, 13a-13]
### (Against Defendant Broadwind)

131.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

132.    By its conduct, Defendant Broadwind failed to file, in accordance with such rules and regulations as the Commission prescribes as necessary or appropriate, such information and documents as the Commission requires to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act, or such annual, quarterly, or other reports as the Commission prescribes, or failed to include, in addition to the information expressly required to be included in any statement or report filed pursuant to Section 13(a) of the Exchange Act such further material information, if any, as may have been necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

133.    By reason of the foregoing, Defendant Broadwind violated Section 13(a) of the Exchange Act [15 U.S.C. § 77q(b)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 13a-1, 13a-13].

## COUNT III

### VIOLATIONS OF SECTION 13(b)(2)(A) OF THE EXCHANGE ACT
### [15 U.S.C. § 78m-1(b)(2)(A)]
### (Against Defendant Broadwind)

134.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

135.    By its conduct, Defendant Broadwind failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected Broadwind's transactions and disposition of assets.

136.    By reason of the foregoing, Defendant Broadwind violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m-1(b)(2)(A)].

## COUNT IV

### VIOLATIONS OF SECTION 13(b)(2)(B) OF THE EXCHANGE ACT
[15 U.S.C. § 78m-1(b)(2)(B)]
(Against Defendant Broadwind)

137.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

138.    By its conduct, Defendant Broadwind failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: transactions were executed in accordance with management's general and specific authorization; transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets was permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

139.    By reason of the foregoing, Defendant Broadwind violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m-1(b)(2)(B)].

## COUNT V

### VIOLATIONS OF RULE 13a-14 UNDER THE EXCHANGE ACT
[17 C.F.R. § 240.13a-14]
(Against Defendant Drecoll)

140.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

141.    By his conduct, Defendant Drecoll, as the principal executive officer of Broadwind at the time of filing of Broadwind's Form 10-K or Form 10-Q, falsely signed personal certifications under Rule 13a-14 of the Exchange Act, indicating, in part, that he reviewed certain Broadwind periodic reports filed with the Commission and that, based on his knowledge, these reports did not contain any untrue statement of material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

142.    By reason of the foregoing, Defendant Drecoll violated Rule 13(a)(14) under the Exchange Act [17 C.F.R. § 240.13a-14].

## COUNT VI

### CONTROL PERSON LIABILITY FOR VIOLATIONS OF SECTION 13(a) OF THE EXCHANGE ACT AND RULES 12b-20, 13a-1, AND 13a-13 THEREUNDER
### [15 U.S.C. § 78t(a)]
### (Against Defendants Drecoll and Kushner)

143.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

144.    As described above, Defendant Broadwind violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m, m-1(b)(2)(A)-(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 13a-1, 13a-13].

145.    Through their positions and by their conduct, Defendant Drecoll and Kushner exercised general control over the operations of Broadwind.

146.    Through their positions and by their conduct, Defendants Drecoll and Kushner possessed the power or ability to control the specific transactions and activities upon which the Broadwinds's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder are based, whether or not that power was exercised.

147.    By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Drecoll is jointly and severally liable with, and to the same extent as, Broadwind for its violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

148.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Kushner is jointly and severally liable with, and to the same extent as, Broadwind for its violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Find that Defendants committed the violations alleged herein.

### II.

Issue orders of permanent injunction restraining and enjoining Defendant Broadwind, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m, m-1(b)(2)(A)-(B)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 13a-1, 13a-13].

### III.

Issue orders of permanent injunction restraining and enjoining Defendant Drecoll, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Rule 13a-14 under the Exchange Act [17 C.F.R. § 240.13a-14], and from controlling any person liable for violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m, m-1(b)(2)(A)-(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 13a-1, 13a-13].

## IV.

Issue orders of permanent injunction restraining and enjoining Defendant Kushner, her agents, servants, employees, attorneys, and all persons in active concert or participation with them, from controlling any person liable for violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m, m-1(b)(2)(A)-(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 13a-1, 13a-13].

## V.

Order Defendants Broadwind, Drecoll, and Kushner to pay disgorgement of ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon.

## VI.

Order Defendants Broadwind, Drecoll, and Kushner to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable pursuant to the

Federal Rules of Civil Procedure.


Dated: February 5, 2015                    Respectfully submitted,

                                           s/ Timothy Leiman

                                           Timothy Leiman (leimant@sec.gov)
                                           John E. Birkenheier (berkenheierj@sec.gov)
                                           Paul M. G. Helms (helmsp@sec.gov)
                                           Kathryn A. Pyszka (pyszkak@sec.gov)
                                           U.S. Securities and Exchange Commission
                                           175 West Jackson Boulevard, Suite 900
                                           Chicago, Illinois 60604
                                           Telephone: (312) 353-7390
                                           Facsimile: (312) 353-7398

                                           *Attorneys for Plaintiff U.S. Securities and Exchange
                                           Commission*